Catherine D. W. v. Deanna C. S., we have Mr. Goroy for the appellant, Ms. Thompson for the appellee. You may proceed, Counselor. Thank you very much, Your Honor. Your Honor, this case presents the question of whether the common law may ever supplement statutory law as a basis for claiming parental rights under either Illinois or federal law. And in saying that Illinois statutory standards were the exclusive basis, the circuit court below shunned to the side 150 years of Illinois precedent and totally ignored federal law. As to Illinois law, in 1856, the Illinois Supreme Court decided Brush v. Blanchard. And there the court said that even though a stepfather was not the parent of children, as it said, the husband is not from the fact of marriage with the mother of minor children bound to support them. As to him, so far as any obligation arising out of the marriage is concerned, they are strangers. But the court nonetheless recognized a parental relationship because of how he had behaved, the conduct as between the individual and the children. And it said, he may, however, by admitting them into his family and treating them as members thereof, voluntarily assume the relation to them of parent. And when this is done, the stepfather stands in place of natural parent and the reciprocal rights, obligations, and duties of parent and child attach. And this remains good law, Your Honor. This case falls squarely within several distinct doctrines that Illinois courts have applied to use common law to supplement statutory standards to protect children. And there are two singular Supreme Court cases from Illinois in the post-Troxell v. Granville era. The first, and I think the most important here, is In re MMD. And there the court said that it will enforce an agreement by a parent to share custody or visitation with a non-parent. And it read Troxell as mandating. It read that as giving life to the parent's due process superior rights. And it said, if a fit parent has a fundamental right to make decisions as to care, custody, and control of their children, then they have a fundamental right to agree to visitation by the child's grandparents if they choose to do so. So on our facts here, Deanna, the parent of Trevor and Kaylee, agreed from the very beginning that she would share full parental custody with Kathy. And Troxell supports that an agreement was enforceable was made. Another case is in re MMD. And there the Supreme Court said that courts can use common law to protect the long-recognized interest in the emotional, psychological, physical, and financial needs of a child. And it specifically said that the court could rely on the common law doctrine of equitable establishment. Now, this case is about protecting children's emotional, psychological, physical, and financial needs. There is also the Ashley Kay case, which comes out of the First District. And it's a pre-Troxell case, but continues to be viable, in which foster parents, who had acted as the only parents that Ashley had known from the time she was born, were found to have an interest in visiting and possibly more as to her. The court reversed, in very, very strong language, a circuit court order that had denied visitation to these former foster parents. It specifically noted expert testimony that this had been a terrible tragedy for Ashley Kay. So the first line of authority is of its best interest in children's tests. The second is by contract. As I said, MMD says Troxell is enlivened by enforcing a parent's contract. So in Purcell, a 2005 case, a man raised a child believing she was his own. He and the mother of the child divorced. As part of the divorce, there's a consent decree and joint parenting agreement. After that, the mother says, well, you're not the real biological parent. So he's a non-biological parent. But the court nonetheless says it is going to enforce the parent's agreement. And it says if parents can restrict visitation, they can also grant that. And courts are obligated to uphold voluntary visitation agreements made by parents. So the same governs here. Voluntary custody-sharing arrangements made between Deanna and Kathy. Separately, the doctrine of estoppel. And all that requires, under a large variety of cases, inter-age slam. Coel versus Zwerin. Did the parent say or do things which led a non-parent to act in a parental role to their detriment? And Coel is perhaps the best illustration there. Their birth mother had falsely advised someone that he was the father. For eight years, he acted as the father. And when she told him he was not the father, he was nonetheless able to have standing to claim visitation and custody rights as to the child he had raised as his own. Finally, Illinois has never used the de facto parent or emotional parent language that we see in many other states. And the states that have that are page 29 of our opening brief, footnote 8. But the spirit of those cases has been applied. If one looks at this Illinois law from Faber, Albert, the Northern District of Illinois case that looked over Illinois law and applied that to find sort of an implied adoption, there's four standards that apply in these cases. One, the non-parent who is claiming parental rights lived together in the same household with the biological parent of the children. That's true here. Two, there was an intention on the part of the biological parent to create some form of parental rights. That's true on our record here as well, Your Honor. Three, the third party's reliance on the encouragement of the birth parent acts in a parental role. That's abundantly true on our facts here, Your Honor. And fourth, a parental child bond is formed. And those four standards, which courts can use to prevent the concern in Troxel that any Tom, Dick, or Harry can come off the street and challenge a parent and the parent is put on defensive, those four standards should give ease and reassurance to the court that it can properly weigh Deanna's rights as a parent and Kathy's rights as a non-parent who has been granted parental rights. In this case, Your Honor, just to briefly go over the key facts, from even before these children were born, this was a longtime couple that agreed they wanted children. They agreed that Deanna would bear the children because she was younger, but that they would share parental rights equally. Even from before the children were born, Kathy helped in the artificial insemination process, both in paying for it and in choosing the appropriate donor. Before the children were born, they consulted an attorney to try to get Kathy the best possible legal rights to be a parent and were advised that the best means for doing so was a co-guardianship. Co-guardianship was important. It was not that Deanna just stayed a parent and Kathy became a guardian. She stepped down, if one may say, to become a co-guardian herself so that they would be on an equal plane as to the children. After that, Kathy refused. Just like adoptions, maybe? It is like adoptions, Your Honor. They were advised that they couldn't do a second parent adoption. But unlike, we'll get to it in a moment, there are a couple of cases that come from our sister districts in this past year that I do want the court to be aware of, where the adoption right was Trump's incentive. They knew they had to adopt, and they didn't. That is not the case here. This is a case where Kathy did, and Deanna did, everything they thought they could do to get Kathy the protection of a legal parent. Acting on that, she acted as their primary caregiver. The record is clear. She did a wonderful job. There are abundant witnesses, doctors, teachers, health care providers, friends, family members, who all attested to this, and Deanna admitted to this as well. And they were co-guardians. That's right. There's never been a question that Deanna's rights are intact. This is a question about sharing custody. This is a question about visitation. This is a question that is, can you cut Kathy completely out of the lives of children that she parented from birth, and that were intended to be a permanent relationship, where there is an absolutely indisputable parent-child bond? Is there a hearing going in Marion now? Well, Your Honor, the hearing has concluded in terms of evidence, and I'm glad you asked that because it's a segue to what I want to talk to the court about. It's certainly Judge Boxley and Judge Sponger. Justice Sponger, no, we've been here before on the guardianship aspect, and the guardianship proceeding just concluded as to evidence. The court has asked us to prepare briefs once we get the record written up, but that hearing provides just a piece of evidence about what the true intent was. The true intent was that Kathy have parental rights, that they went through the legal loops to get what they thought they could to solidify that is a piece of evidence. But, Your Honor, that hearing also illustrates the problem of a guardianship and why that is simply not enough here and why Kathy initiated this proceeding. If Your Honor will recall, in that case, Kathy was on the defensive, thinking that Deanna would abide by the guardianship. When Deanna left the household, she didn't do anything. Deanna then moved to terminate even guardianship, and Kathy was helped by this court to have standing to defend that status, and she's tried to do so. But in that case, the circuit court has said repeatedly, Kathy is not a parent, and therefore the court will not book at any of the parental rights cases I have been citing to you and that are, you know, abundantly discussed in our brief. The court has said it's not a custody case. And when we've asked for temporary visitation in the course of what's now been a year and a half long proceeding, the TPS decision of this court came down originally in May 11th of 2011, and Kathy has not seen these children in years, despite that opinion, because this court said she's not, it's not about visitation, it's not about custody, it's simply a question of guardianship. And guardianship is frankly too cramped a standard for the rights she has. Well, the guardianship statute specifically provides for visitation rights, though. It does, Your Honor. We certainly call that to the court's attention. I do believe the court has erred here. If for some reason we can't in our post-trial briefs persuade the court of that, I'm afraid Your Honors will have a third opinion, a third appeal by us. But I do want the court to understand why you have a second proceeding. The judge down there hasn't ruled down there in Marin? He has not ruled. So what we did at the close of evidence, we moved Judge Lewis, you're sitting here, Your Honor, now that you've heard all the evidence, and frankly it's stronger than we have in our briefs, because we have among other things text messages where Deanna says, I would never keep the children from you. That would harm them. We have expert witnesses who come in and talk about that standard. So at the close of evidence, we moved for visitation while the court decides the matter, that she could at least see the children. We agreed it would be under any circumstance and restriction the court wanted, and the court said no, and the court said, let me be clear, she is not a parent. Let me be clear, this is not a custody case, and let me be clear, don't cite those cases to me. I don't think they apply. Now, I think the court's acting in good faith, but I don't think he's correct. And I think it illustrates the limits, the tentativeness of a guardianship. An easy way to put it, Your Honors, is if any of you are parents, I'm sure you would rather have the full legal rights that Illinois grants to a parent than the much more limited and tenuous rights that are granted to a guardian. But in this case, the guardianship, it's an atypical guardianship. When we usually think of guardianships, we think of a parent with a disability. We think of something temporary. A co-guardian. That's right. A co-guardian. Exactly. She steps down from her parental role to be a guardian herself. Now, she doesn't have to do that. She's doing that, the evidence we think would show, because she wants to be in the same place as Kathy as much as possible. And that's why we feel it would be a shame if the fact that they actually went through legal hoops would somehow be used as a basis for limiting her rights. The Mancine case out in the first district, and Your Honors may not know, but there's a second district case that came down last Friday, which we'll be calling to Your Honors' attention, called Scarlett, both of which deny standing. But both of those are cases where the husband, in a dissolved relationship case, or someone who stood as a husband, had the ability to adopt, knew of the necessity to and couldn't, and frankly neither of those cases consider MMD and Purcell and the whole idea that a parent, by agreement, not only can say these are what I want and have that be enforceable, but that that gives life to their due process rights, what the courts have said in MMD. So we think they're wrong. We think they also apply an incorrect equitable estoppel standard. They require a deferment of misrepresentation that essentially collapses equitable estoppel and fraud. It's not been the case in MJ. It wasn't the case in Schlamm, which we cite. The last thing I want to say is even if they're writing Illinois law below, there's also a federal interest here, and federal, the U.S. Supreme Court has been very clear, Moore v. City of East Cleveland, Prince v. Massachusetts, that a non-traditional family may be entitled to constitutional protection under federal law. And Judge, Sir Clark Blount has simply ignored the separate federal bases for standing that are already there. Again, Your Honor, today we're just asking, can Cathy have her day in court on really what is the proper test? Is she a parent? I think there's going to be a lot that we can probably use the record. When would the judge down in Marion have an R yet? I'm sorry? When would he have the R? Well, we're supposed to, in 14 days, submit joint post-trial briefs. And he's been quick in ruling. I would assume by October or November we'll have the ruling, but the court hasn't committed to a specific date. Thank you, Your Honor. Thank you. I have an opportunity for a rebuttal. Thank you very much, Your Honor. Ms. Thompson?  Thank you, Judge. My name is Julie Thompson, and I am here today covering for trial counsel Theresa Mutchko Hopkins, who was unable to be present today. I am here to represent the interests of Deanna, the respondent appellee in this matter. What has happened here began as a guardianship situation, where the same-sex couple decided, one of them decided to have children, and the party subsequently wanted some way to ensure that those, if there were a situation where something had happened to the biological parent, that the children would remain with the parent's partner, Kathy, who is the appellant in this matter. The position has been taken here that by virtue of agreeing to the entry of a guardianship order, that Deanna somehow has forfeited her parental rights or has diminished her own parental rights. And we would disagree with that, Your Honors. We would take the position simply this, that by entering those guardianship orders involving those two children, Kathy became a guardian, Deanna became a guardian, and remained a parent. Put that language in there, agreement, because she chose to become equal with Kathy. She chose in the guardianship matter to become equal with Kathy, Your Honors, which is why the co-guardianship was done the way it was done. And it was unusual. And, frankly, it was done after the courts in Illinois had recognized that same-sex couples, in fact, had a legal right to adopt children, and the case involving that is cited in the brief. In 1995, same-sex couples were given the right to adopt children. If Kathy had been given proper legal advice, we probably would never be here. And wouldn't be here today, right? No, we would not. Assuming that people wanted to do it. That they wanted to do it. Okay. And there is information in the trial that was presented in the trial court by virtue of affidavits that were appended, I believe, to the record in this matter indicating, frankly, that Deanna had no interest in an adoption. She would not allow it. That's what the record indicates. We're at a dismissal stage where we have to take the allegations of the complaint as true, and that's really where we're getting our facts here, right? So given that consideration, the question is, you know, is there any cause of action under those facts? As alleged. Yes, Your Honor, I understand that. And we would say to this court that there is not a cause of action under these facts. There is a cause in the guardianship case. Obviously, this court has ruled such. That trial has been held in the trial court. We're awaiting a decision. But while that case was pending, Kathy brought a petition in family court. And in family court. Let me just ask a question to make sure. These are separate cases filed in the trial court, right? They are two separate cases. These were not in the same case. They were not. And they were not consolidated, Your Honor. There's a P case designation in the guardianship and an F case designation on the family case. So while that guardianship issue was pending, Kathy brought this petition in the family court seeking custody or visitation rights. It was a petition to establish paternity custody visitation in child support. Deanna responded to that with a motion to dismiss, alleging that there was no standing under the terms of the statute to allow Kathy to file this petition and proceed. The trial court heard argument. They heard there was a fairly significant memorandum of law submitted by counsel for Kathy. And the trial court dismissed the petition. That is what resulted in this appeal. Counsel wants you to take the guardianship and what happened in the guardianship. And from that determined that Deanna has somehow done something to either diminish her own parental rights or to grant parental rights to Kathy. But what we know is, is that a grant of parental rights by statute in the state of Illinois comes through an adoption or an action brought under the paternity statutes, the Parent Ejection of 1984. Could a parent under any circumstance contract away the standing provisions of the statute? I mean, let's just say, I mean, this is, you know, hypothetical, but let's just say you entered into a contract. Everybody signed it that in the event that the non-parent were to seek custody, the parent agrees to never raise the issue of standing under 601B2 or whatever it is. I think if it were that specific, you probably could. I think what's being argued here is that, first off, there was no memorialization of any contract. Well, the argument here under the allegations is that in effect, you know, the agreement was that Kathy would be treated like a parent in all respects. I don't know that a party has the right by their own agreement to contradict the laws of the state of Illinois with regard to the standing requirements in the statute. And that would be my position on that. I think that contract would conflict with statute. Okay. I also think, I know that in the trial court that argument was made, and counsel for Deanna at that time took the position, frankly, that any type of contract for a child smacks way too closely to the purchasing and sale of the child. And for moral and public policy reasons, obviously, should not be allowed by any court to occur. Obviously, there are several, there are four, I believe, standing sections in the Illinois Marriage and Dissolution of Marriage Act that a party has to meet in order to bring, or a party has to meet at least one of those four in order to bring an action seeking custody or visitation of a child. There are two of those that are significant in this particular case. The first is at 750 ILCS 5-601, subparagraph B-2, which we believe is the significant statute that applies here, standing for a non-parent, a person can file a petition seeking custody as a non-parent only if a child is not in the physical custody of that child's parent. And there's no question here that the children have always been in the custody of their parent, Deanna. Because they can't meet that requirement of the standing statute, what they sought to do is to try to find a way to wedge this under 750 ILCS 5-601 E-1, which any parent who seeks custody of a child, all they have to do is file a petition. If they can find a way to call her a parent, she can bring this petition. And that's what the rest of their argument is based on. They want you to acknowledge an in loco parentis doctrine, they want you to accept a contract theory or some type of estoppel theory, all based on common law, all based on very old common law in the state of Illinois, all intended to convince this court to extend and expand the rights that Kathy was given as a guardian and to call her a parent. If they can name her a parent, they can wedge her into this statute and bring a custody action. What we would argue, Your Honor, is simply this. The common law, the most recent common law that applies in this matter, is the Mancine case from 2012. And in that common law, they say standing to seek custody is found solely within the Illinois Marriage and Dissolution of Marriage Act or the Parent to Jackson. They cite you back to the statutes. They're caught in a loop, and they can't find a way out. And the only way out is if you label Kathy a parent. And there is no statutory basis in which to do that, and there is no common law basis in which to do that. And for those reasons, we would ask that the circuit court's decision denying and dismissing this petition be affirmed. Excuse me. When will Judge Lewis have an order right now? What I would expect, Your Honor, frankly, is within a matter of less than 30 days. I would expect within less than 30 days. He rules quickly. My experience with him has been that he does rule quickly. If he's given the parties the opportunity to brief normally within seven days of receiving briefs, we have a decision from Judge Lewis. Thank you. Thank you, counsel. Mr. Groff. Your Honor, I question whether a parent can contract away her objections to standing. And that really, again, takes us to MMD and Purcell. And Ms. Thompson didn't address those cases, much like Mancine didn't address those cases, much like the Scarlet case that the Second District decided didn't address those cases. But they're vitally important here. I mean, MMD said that the need to shield parental decision-making from second-guessing by the state is not implicated when a parent agrees. A consent decree is based upon an agreement of the parties and is contractual in nature. And it says there's no corresponding constitutional prohibition against a fit parent's decision to voluntarily bestow visitation privileges. So that's MMD. And MMD is running against the backdrop of the fact that we have statutory standards in the IMDMA, which is not what – Kathy's not saying she satisfies those statutory standards. We recognize she doesn't. The question is, is there a place in the common law to supplement? And Mancine is wrong. Scarlet is wrong because they continue an error of – that was made by the First District and CBL, which is essentially to say that when the legislature has said nothing about restricting a parent's right to contract, when it has said nothing about, you know, arrangements by contract supplementing statutory law, that somehow there is a repeal because there's a lot of provisions of the IMDMA. And as Your Honors know, repeals by implication are not favored. We have a statute that basically says on the common law that the common law is generally deemed to supplement. And there's no showing of any need to repeal here. Ms. Thompson talked about the guardianship. And as we talked about, the guardianship doesn't fit properly here to describe the full scope of the relationship. And we are not saying that every guardianship is a basis for parental rights. We are saying that under the circumstances here, where the guardianship is just a piece of the puzzle, where Deanna stood up before friends and said, we are going to co-parent these children, where Kathy became the primary caregiver for years without any compensation, where Deanna encouraged that the children call her mom, and she was sent cards that say, you're the number one mom, your son and I love you very much. Text messages, I would never take these children away from you, that would harm them. That is the record before you, and it is on that record that we are claiming that in this specific unique instance,  an analogy perhaps imperfect, Your Honors, would be like in the statute of frauds. When you have a writing such as a check or another document, that will satisfy that there is a contract, but it will not necessarily evidence the sum total of the contract. That was the point I was trying to get at on a written contract. I mean, this is all just this would be evidence. That would be very strong evidence of a contract. If you have a written, signed contract that specifically said, I hereby give up any claim to standing. But it's still a question of proof. Exactly. As Robert knows, the writings that attach to the guardianship are writings. There are other writings in the case. But it would be great if they had a written contract that would have helped a lot. They just don't. Your opponent's argument, however, would be that because of the statute, it wouldn't matter if it was in writing, you'd never get to present that proof. That's right. And she is bolstered by Mancini, who basically says that the only route is through statute. But Your Honors know that we have 150 years of law saying, no, we use common law to plug the holes to do what is best for children. The only other thing I would add is Ms. Thompson didn't address the federal issue because, frankly, she can't. Those cases are very clear that that's an independent basis for standing here. Thank you very much, Your Honors. Thank you both for your briefs and arguments. We'll do our best to expedite this position and get you an opinion. We will be in recess until 1 o'clock. All rise. Thank you.